Filed 3/18/22  P. v. Lopez CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>ENRIQUE NUNEZ LOPEZ,<br><br>    Defendant and Appellant. | H047254<br>(Monterey County<br>Super. Ct. No. SS121859B) |

In 2014, a jury convicted petitioner Enrique Nunez Lopez of second degree murder under a natural and probable consequences theory, among other crimes.  We affirmed Lopez's convictions on direct appeal (*People v. Lopez* (May 31, 2018, H042227) [nonpub. opn.]) (case No. H042227).  Subsequently, the Legislature enacted Senate Bill No. 1437 (2017-2018 Reg. Sess.), which eliminated natural and probable consequences liability for murder.  Senate Bill No. 1437 also enacted Penal Code section 1170.95,[1] which permits a person convicted of murder under certain theories, including natural and probable consequences, to petition the sentencing court to have his or her murder conviction vacated and to be resentenced on any remaining counts.

In 2019, Lopez sought resentencing under section 1170.95.  The trial court issued an order to show cause but denied the petition after an evidentiary hearing, concluding that the prosecution had carried its burden to prove beyond a reasonable doubt that Lopez could still be convicted of murder under current law on an implied malice theory.

---

[1] All further statutory citations are to the Penal Code unless otherwise indicated.

On appeal from that denial, Lopez raised a number of claims, including that the trial court had incorrectly applied a sufficiency of the evidence standard in denying his petition. In a prior opinion, we agreed with Lopez that section 1170.95 requires the prosecutor to prove beyond a reasonable doubt each element of first or second degree murder under current law in order to establish ineligibility for section 1170.95 relief. But we concluded that the trial court had properly applied that standard. We rejected Lopez's other claims for relief and affirmed.

The California Supreme Court granted review (February 10, 2021, S265974). While the matter was pending in the Supreme Court, the Legislature amended section 1170.95. (Stats. 2021, ch. 551, § 2; Senate Bill No. 775.) The Supreme Court transferred the matter back to this court with directions to vacate our original opinion and reconsider the cause in light of Senate Bill No. 775. The parties have filed supplemental briefs. (Cal. Rules of Court, rules 8.528(f), 8.200(b).) Having reconsidered the cause in light of Senate Bill No. 775, we affirm.

## I. BACKGROUND

### A. Factual Summary[2]

In 2012, Lopez, then a member of the Sureño gang La Esperanza Trece (Espe), accused fellow gang member Daniel "Frosty" Fraga of being "no good" at a gang meeting. The meeting was attended by about 10 Espe members, including Juan Salazar, Jr. According to a number of Espe members, at Lopez's urging, the gang held a vote to determine whether Frosty was no good, meaning he could be killed by members of Espe. There was some disagreement among the Espe witnesses as to the outcome of the vote. Three testified that the group decided Frosty was no good. Two testified that the majority agreed Frosty was no good but that no final decision was made, either

---

[2] We take the facts from our prior opinion in case No. H042227, where they are set forth more fully. On our own motion, we take judicial notice of that prior opinion. (Evid. Code, §§ 452, subd. (d), 459.)

2

because they were awaiting proof or because only gang members in county jail can decide whether a person is no good. And two testified there was no vote; however, one of those witnesses (Lopez's brother) admitted having told police that the group had decided to kick Frosty out of the gang because he was no good. A gang expert testified that every Sureño and every member of the Mexican Mafia has an obligation to kill former Sureños who they know have been deemed no good.

Later on the day of the no-good vote, Frosty—accompanied by his friend Hector "Osito" Reyes—confronted Lopez at the home of Salazar's girlfriend. Lopez, Salazar, and the other Espe members who had participated in the no-good vote were hanging out there. A fight broke out. It began when Frosty punched Lopez. Lopez's brother, known as Dodger, came to Lopez's defense. When a gang member known as Shadow tried to break up the fight, Osito hit him in the head with the butt of a gun. Osito also hit Dodger in the head with the gun several times, inflicting an injury that required surgical staples. Lopez was stabbed in the arm during the fight. He and Dodger fled the house. Shadow ended up in the bathroom with Osito, who was still armed with a gun, and Frosty, who had a pair of scissors. Shadow was able to escape the bathroom unharmed and fell to the floor in the hall outside the bathroom. Salazar fatally shot Frosty and Osito from the hallway outside the bathroom, a distance of about nine feet from where their bodies were found. Frosty suffered three gunshot wounds; Osito suffered six or seven gunshot wounds. Some of each victim's gunshot wounds had a downward trajectory, which the forensic pathologist who performed the autopsies opined demonstrated that the victims were bending over or on the floor when they sustained those wounds.

### B. *Procedural History*

The Monterey County District Attorney charged Salazar and Lopez with two counts of murder each (counts 1-2; § 187, subd. (a)) and with the substantive offense of active participation in a criminal street gang (count 6; § 186.22, subd. (a)). They also were charged with battery with serious bodily injury (count 3; § 243, subd. (d)); assault

3

with force likely to produce great bodily injury (count 4; § 245, subd. (a)(4)); and child abuse (count 5; § 273a, subd. (a)) arising out of the "checking" of a 17-year-old member of the gang as punishment for dating a Norteño.[3] Gang enhancement allegations were attached to counts 1 through 5.

A jury trial took place in August and September 2014. Salazar's defense to the murder charges was that he acted in self-defense or in defense of another, Shadow. The jury rejected those defenses and convicted Salazar of first degree murder of Frosty and Osito. Salazar was convicted on all of the other charges as well, and jurors found true the gang allegations.

At trial, the prosecutor argued that Lopez was guilty of the murders as an aider and abettor on the theory that the murders were the natural and probable consequence of the substantive gang offense (and specifically of Lopez's actions surrounding the no-good vote). Jurors failed to reach a verdict as to count 1, which charged Lopez with Osito's murder; the court declared a mistrial as to that count. The jury convicted Lopez of second degree murder of Frosty and found true the gang allegation attached to that count. The jury also found Lopez guilty of counts 3 through 6 and found true the gang allegations attached to counts 3 through 5.

The trial court sentenced Lopez to 22 years to life in prison. In a prior opinion, we affirmed Lopez's convictions on direct appeal (case No. H042227).

Lopez filed a section 1170.95 petition on February 5, 2019. The trial court appointed the public defender to represent Lopez. The prosecutor conceded that Lopez had made a prima facie showing of entitlement to relief but opposed his petition on the ground that he could be convicted of murder under current law. The case proceeded to the hearing stage. No new evidence was admitted. Rather, the prosecutor argued that the

---

[3] "Checking"—a 13-second beating of a gang member by fellow gang members— is a common form of discipline in Sureño gangs.

4

trial evidence proved Lopez's guilt of second degree murder under an implied malice theory. Lopez's counsel contended that the evidence failed to prove that Lopez's act of calling for the no-good vote was a proximate cause of Frosty's death or that Lopez acted with implied malice.

On September 5, 2019, the trial court denied the petition, stating that the People had carried their burden "to show beyond a reasonable doubt that [Lopez] could still be convicted of murder under the current statute," namely implied malice murder. In reaching that conclusion, the court expressed the view that Lopez "certainly . . . would know" that "calling a meeting with associates and saying, [']Hey, I think, you know, so and so is no good['] . . . meant [that] individual was basically marked for death."

Lopez timely appealed.

## II.   DISCUSSION

### A.   *Legal Principles*

Prior to the enactment of Senate Bill No. 1437, "an aider and abettor [was not required to] personally possess malice, express or implied, to be convicted of second degree murder under a natural and probable consequences theory." (*People v. Gentile* (2020) 10 Cal.5th 830, 847 (*Gentile*).) Indeed, " 'the mens rea of the aider and abettor with respect to [the nontarget] offense [was] irrelevant [because] culpability [was] imposed simply because a reasonable person could have foreseen the commission of the nontarget crime.' [Citation.]" (*People v. Chiu* (2014) 59 Cal.4th 155, 164, superseded by statute as stated in *People v. Lewis* (2021) 11 Cal.5th 952, 959, fn. 3 (*Lewis*).)

Effective January 1, 2019, Senate Bill No. 1437 amended section 188 to provide that, outside the context of felony murder, "in order to be convicted of murder, a principal in a crime shall act with malice aforethought. Malice shall not be imputed to a person based solely on his or her participation in a crime." (Stats. 2018, ch. 1015, § 2.) "The natural and probable consequences doctrine is incompatible with this requirement . . . ."

5

(*Gentile*, *supra*, 10 Cal.5th at p. 847.) Accordingly, our Supreme Court has concluded that "Senate Bill 1437 eliminates natural and probable consequences liability for murder regardless of degree." (*Id.* at pp. 847-848.)

Senate Bill No. 1437 also enacted section 1170.95, subdivision (a), which permits a person convicted of murder under a natural and probable consequences theory to petition the sentencing court to have his or her murder conviction vacated and to be resentenced on any remaining counts. Under section 1170.95 as it was originally enacted, a person was entitled to section 1170.95 relief if, among other things, he or she "could not be convicted of first or second degree murder" following the enactment of Senate Bill No. 1437.[4] (Former § 1170.95, subd. (a)(3).)

In the immediate wake of the enactment of section 1170.95, the Courts of Appeal were split as to the meaning of "could not be convicted of first or second degree murder," as that phrase was used in former section 1170.95, subdivision (a)(3). Some courts read that phrase as importing the substantial evidence standard into section 1170.95. (See *People v. Garcia* (2020) 57 Cal.App.5th 100, 115, review granted Feb. 10, 2021, S265692, transferred to the Court of Appeal Dec. 29, 2021, with directions to vacate its decision and reconsider the cause in light of *Lewis*, *supra*, 11 Cal.5th 952 and Senate Bill No. 775 [concluding that petition at issue failed to make prima facie showing because "substantial evidence support[ed] a murder conviction based on a direct aiding and abetting theory"]; *People v. Duke* (2020) 55 Cal.App.5th 113, 123, review granted Jan. 13, 2021, S265309, transferred to the Court of Appeal Nov. 23, 2021, with directions to vacate its decision and reconsider the cause in light of Senate Bill No. 775 [holding that, at the evidentiary hearing phase, "the prosecution must . . . prove . . . that a reasonable jury could find the defendant guilty of murder with the requisite mental state

---

[4] Section 1170.95 has since been amended and subdivision (a)(3) now provides: "The petitioner could not presently be convicted of murder or attempted murder because of changes to Section 188 or 189 made effective January 1, 2019."

6

for that degree of murder"].)  This court rejected that approach, instead concluding in our prior opinion in this case that, at the evidentiary hearing stage, the prosecutor bears the burden to prove beyond a reasonable doubt the elements of first or second degree murder under the current law.  Some other courts took the same approach.  (See *People v. Rodriguez* (2020) 58 Cal.App.5th 227, 230-231, review granted March 10, 2021, S266652, transferred to the Court of Appeal Dec. 22, 2021, with directions to vacate its decision and reconsider the cause in light of Senate Bill No. 775; *People v. Duchine* (2021) 60 Cal.App.5th 798.)

The Legislature resolved the issue with the passage of Senate Bill No. 775, which "[r]eaffirms that the proper burden of proof at a resentencing hearing under this section is proof beyond a reasonable doubt."  (Stats. 2021, ch. 551, § 1, subd. (c).)  As amended by Senate Bill No. 775, section 1170.95, subdivision (d)(3) states in relevant part:  "At the hearing to determine whether the petitioner is entitled to relief, the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is guilty of murder or attempted murder under California law as amended by the changes to Section 188 or 189 made effective January 1, 2019. . . .  A finding that there is substantial evidence to support a conviction for murder, attempted murder, or manslaughter is insufficient to prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing."

Senate Bill No. 775 made other changes to section 1170.95 as well.  In particular, it "[c]larifie[d] that persons who were convicted of attempted murder or manslaughter under a theory of felony murder and the natural probable consequences doctrine are permitted the same relief as those persons convicted of murder under the same theories." (Stats. 2021, ch. 551, § 1, subd. (a).)  It "[a]ddresse[d] what evidence a court may consider at a resentencing hearing . . . ."  (Stats. 2021, ch. 551, § 1, subd. (d).)  It added subdivision (g) to section 1170.95, which provides that "[a] person convicted of murder . . . whose conviction is not final may challenge on direct appeal the validity of that

conviction based on the changes made to [s]ections 188 and 189 by Senate Bill 1437." And it "[c]odifie[d] the holdings of *People v. Lewis* (2021) 11 Cal.5th 952, 961-970 , regarding petitioners' right to counsel and the standard for determining the existence of a prima facie case." (Stats. 2021, ch. 551, § 1, subd. (b).)

### B.     The Trial Court Applied the Required Beyond a Reasonable Doubt Standard at the Evidentiary Hearing

Lopez argues that the trial court applied the incorrect legal standard when it denied his petition. In his view, the trial court applied the substantial evidence standard of review, denying his petition based merely on the existence of sufficient evidence to support a murder conviction. For that argument, he relies on the trial court's ruling that the People met their burden "to show beyond a reasonable doubt that [Lopez] could still be convicted of murder . . . ." But that statement provides no support for Lopez's position, as the trial court merely used the statutory language, which does not convince us that the court misapplied the law.

To the contrary, the record persuades us that the trial court applied the proper standard. First, the parties correctly argued below that the trial court could deny the petition only if it found that the elements of second degree implied malice murder had been proved beyond a reasonable doubt. Specifically, the prosecutor argued that the petition should be denied because "Lopez is guilty of second-degree murder" because his acts were the proximate cause of Frosty's death and because Lopez acted with reckless indifference to human life. And the prosecutor urged the trial court to "find that Lopez acted with a reckless indifference to human life when he organized a criminal street gang meeting for the sole purpose of having Fraga determined to be no-good." The prosecutor did not ask the court to apply the substantial evidence standard. Lopez's trial court brief asserted that the pertinent question was "whether the facts show beyond a reasonable doubt that, with implied malice, Lopez caused the death of Frosty." At the hearing, Lopez's counsel framed the question as "whether or not implied malice was proven

8

beyond a reasonable doubt." Neither the prosecutor nor the trial court took issue with defense counsel's characterization of the applicable legal standard.

Second, the trial court's statements at the hearing indicate that it applied the correct standard. The court concluded that the elements of implied malice murder "were satisfied with the evidence that was brought out during the trial, and of course, I was the trial judge." As to Lopez's mens rea, the court stated that trial testimony showed that Lopez knew that voting Frosty "no good" meant Frosty "was basically marked for death." The foregoing statements show that the court understood it was required to find the elements of murder had been proved, not find merely that there was sufficient evidence from which some hypothetical jury could make such findings. Moreover, the trial court referenced the beyond-a-reasonable-doubt standard of proof and never used the words "substantial evidence," "sufficient evidence," or made any other indication that it was applying a sufficiency of the evidence standard.

## C.    *Sufficiency of the Evidence Supporting the Trial Court's Ruling*

Next, Lopez challenges the denial of his petition on grounds of insufficient evidence. He says the evidence showed neither that his acts were the proximate cause of Frosty's death, nor that he acted with the requisite mens rea.

### 1.    *Legal Principles and Standard of Review*

"[S]econd degree murder . . . is 'the unlawful killing of a human being with malice aforethought but without the additional elements, such as willfulness, premeditation, and deliberation, that would support a conviction of first degree murder.' [Citation.] Malice may be either express (as when a defendant manifests a deliberate intention to take away the life of a fellow creature) or implied. [Citation.] 'Malice is implied when the killing is proximately caused by " 'an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life.' " [Citation.]' "

9

(*People v. Cravens* (2012) 53 Cal.4th 500, 507.) Our Supreme Court has " 'interpreted implied malice as having "both a physical and a mental component. The physical component is satisfied by the performance of 'an act, the natural consequences of which are dangerous to life.' [Citation.] The mental component is the requirement that the defendant 'knows that his conduct endangers the life of another and . . . acts with conscious disregard for life.' [Citation.]" ' [Citation.]" (*People v. Soto* (2018) 4 Cal.5th 968, 974.)

Of course, " '[a]n element of [any] homicide is that the defendant's criminal act or omission be the proximate cause of the death. [Citation.]' [Citation.]" (*Zemek v. Superior Court* (2020) 44 Cal.App.5th 535, 552; CALCRIM No. 520 [listing "The defendant committed an act that caused the death" as an element of implied malice murder].) An act "causes death if the death is the direct, natural, and probable consequence of the (act/[or] failure to act) and the death would not have happened without the (act/[or] failure to act). A *natural and probable consequence* is one that a reasonable person would know is likely to happen if nothing unusual intervenes. . . . [¶] [There may be more than one cause of death. (An act/[or] (A/a) failure to act) causes death only if it is a substantial factor in causing the death. A *substantial factor* is more than a trivial or remote factor. However, it does not need to be the only factor that causes the death.]" (CALCRIM No. 520.) " '[A]n "independent" intervening cause will absolve a defendant of criminal liability.' " (*People v. Cervantes* (2001) 26 Cal.4th 860, 871 (*Cervantes*).) An independent intervening cause is " ' "unforeseeable[,] . . . an extraordinary and abnormal occurrence, which rises to the level of an exonerating, superseding cause." ' " (*Ibid.*) By contrast, a dependent intervening cause—one that " ' "is a normal and reasonably foreseeable result of defendant's original act" ' "—does not relieve the defendant of criminal liability. (*Ibid.*)

As discussed above, we review sufficiency of the evidence challenges to judgments of conviction for substantial evidence. The same standard applies to the

10

review of post judgment orders, such as section 1026.5 orders extending state hospital commitments (*People v. Crosswhite* (2002) 101 Cal.App.4th 494, 507-508) and orders denying resentencing under section 1170.18 (Proposition 47) (*People v. Sledge* (2017) 7 Cal.App.5th 1089, 1096). But Lopez urges us to apply an independent standard of review, which he says applies to the review of orders based on findings "made by a postconviction trial court based upon review of transcripts." He argues that no deference to the trial court's factual findings is appropriate because "the trial court primarily reviewed this Court's [prior] opinion and the probation report" and did not rely on the "credibility of live witnesses."

We are not persuaded. As noted above, the substantial evidence standard of review is not reserved for the review of jury findings; it has been applied to postjudgment orders involving judicial factfinding. Furthermore, the record does not support Lopez's contention that the trial court relied primarily on documentary evidence. Rather, in making her factual findings, the trial court judge referenced witness testimony as to the meaning of a no-good determination and trial evidence more generally, noting that she "was the trial judge." While the trial court judge noted that she also reviewed this court's prior decision, the parties' briefs, the probation reports, and "some of [her] notes at the time and that [she] made . . . in preparation of sentencing," the record as a whole demonstrates that she made her findings based on the trial evidence, which she observed firsthand. We shall apply the substantial evidence standard of review.

### 2. *There is Sufficient Evidence of Proximate Causation*

Lopez argues there was insufficient evidence that his acts surrounding the no-good vote were the proximate cause of Frosty's death because Frosty's attack and Salazar's

11

premeditated shooting constituted independent intervening causes which absolved him of any liability for Frosty's death.[5]

To reiterate, an independent intervening cause is " ' "unforeseeable[,] . . . an extraordinary and abnormal occurrence, which rises to the level of an exonerating, superseding cause." ' " (*Cervantes*, *supra*, 26 Cal.4th at p. 871.) By contrast, " ' "[i]f an intervening cause is a normal and reasonably foreseeable result of defendant's original act the intervening act is 'dependent' and not a superseding cause, and will not relieve defendant of liability.[6] [Citation.] '[ ] The consequence need not have been a strong probability; a possible consequence which might reasonably have been contemplated is enough. [ ] The precise consequence need not have been foreseen; it is enough that the defendant should have foreseen the possibility of some harm of the kind which might result from his act.' [Citations.]" ' " (*Ibid.*)

Substantial evidence supports the trial court's implied finding that Frosty's act of starting a physical fight with Lopez was a dependent intervening cause. At trial, three

---

[5] Lopez couches this argument as an attack on the sufficiency of the evidence of implied malice. However, it is more accurately characterized as a challenge to the sufficiency of the evidence of proximate causation and we treat it as such. As noted, implied malice and proximate causation are distinct elements of implied malice murder. *Cervantes*, *supra*, 26 Cal.4th at p. 872, the case on which Lopez relies, involved a challenge to the sufficiency of the evidence of the "element of proximate causation."

[6] In his supplemental posttransfer brief, Lopez argues that the "reasonably foreseeab[le] part of the intervening cause analysis has been eliminated by S.B. 1437, S.B. 775 and § 1170.95, because it imputes liability to a defendant without a subjective appreciation of the risk of death." We disagree. "[F]oreseeability is an important component of causation . . . ." (*People v. Fiu* (2008) 165 Cal.App.4th 360, 372.) Indeed, CALCRIM No. 520 states that an act "causes death if the death is the direct, natural, and probable consequence of the act." That language, "requiring . . . death to be a direct, natural, and probable consequence of a defendant's act necessarily refers to consequences that are reasonably foreseeable." (*Fiu*, at p. 372.) Senate Bill No. 1437 did not remove the concept of foreseeability from the legal definition of causation merely by eliminating natural and probable consequences liability for murder.

12

Espe members and the gang expert each testified that a gang member who is accused of being no good would be expected to confront his or her accuser. The gang expert testified that the ensuing confrontation would be "violent," involving a fistfight and, in some instances, weapons. The trial court reasonably could have inferred from the foregoing testimony that Frosty's attack was a normal and reasonably foreseeable result of Lopez's acts of accusing Frosty of being no good and urging the gang to deem him no good.[7]

Substantial evidence likewise supports the trial court's implied finding that Salazar's act of shooting Frosty was a dependent intervening cause. The gang expert testified at trial that a gang member who has been deemed no good is "marked for death" and that every Sureño has an obligation to kill him. Six Espe members testified that someone who has been deemed no good can be killed by their former fellow gang members. Only Lopez's brother hedged on that point. And he admitted telling police that being no good could get you killed. The trial court reasonably could have concluded based on the foregoing testimony that Lopez " ' "should have foreseen the possibility" ' " of Frosty being killed by a member of Espe as the result of his actions surrounding the no-good vote. (*Cervantes*, *supra*, 26 Cal.4th at p. 871.)

In his posttransfer reply brief, Lopez argues that Salazar could not have been acting on the no-good determination because Frosty had not in fact been deemed no good, either because the determination was under investigation or because he had successfully challenged Lopez. This argument was not raised in any prior brief, here or in the trial court. Accordingly, it has been waived. It also lacks merit. The expert opined

---

[7] This implied finding arguably was compelled by the jury's verdict. As we noted in our decision on direct appeal, "[i]n reaching [its] verdict, . . . the jury must have concluded that Frosty's act of starting a physical fight with Lopez was not ' " 'an extraordinary and abnormal occurrence.' " ' (*Cervantes*, *supra*, 26 Cal.4th at p. 871.)" (*People v. Lopez*, *supra*, H042227.)

based on the totality of the evidence that Frosty had been declared no good, not that an investigation was ongoing. Moreover, even if the evidence might support a finding that Frosty's no-good status was pending, substantial evidence supports the trial court's implied findings that Frosty had been deemed no good and that Salazar acted on that fact.

We reject Lopez's argument that our prior opinion in his direct appeal in any way "preclude[d] a finding that Salazar's shooting of Frosty was reasonably foreseeable." On direct appeal, Lopez argued that his trial counsel rendered ineffective assistance by persuading the trial court not to give the jury manslaughter verdict forms. We rejected that claim, reasoning that there was no evidence from which a reasonable jury could have concluded that it was reasonably foreseeable that Salazar would kill Frosty *in a heat of passion*, thereby committing voluntary manslaughter for which Lopez could be liable under a natural and probable consequences theory. We did not conclude that a deliberate killing by Salazar (or any other Espe member) based on the no-good order was unforeseeable.

*Cervantes*, on which Lopez relies, is distinguishable. In *Cervantes*, the defendant was "a member of a street gang, who perpetrated a nonfatal shooting that quickly precipitated a revenge killing by members of an opposing street gang." (*Cervantes*, *supra*, 26 Cal.4th at p. 863.) Our Supreme Court reversed the defendant's conviction for second degree murder under the provocative act doctrine, finding insufficient evidence of proximate causation. The court reasoned that "the actual murderers were not responding to defendant's provocative act"; they " 'intend[ed] to exploit the situation created by [defendant], but [were] not acting in concert with him,' a circumstance that is 'normally held to relieve the first actor [defendant] of criminal responsibility.' " (*Id*. at pp. 872-874.) Here, the People have never advanced a provocative act theory of murder. More significantly, there was evidence in this case from which a trier of fact could have concluded that Salazar killed Frosty in response to the no-good vote (which Lopez instigated). And, unlike in *Cervantes*, here Salazar and Lopez were in the same gang, so

14

it was not the case that Salazar was exploiting a situation created by Lopez without acting in concert with him.

In his posttransfer brief, Lopez argues that the intervening causation issue "bears further consideration because the Supreme Court is currently considering the effect of S.B. 775 on the related concurrent causation doctrine," citing *People v. Carney* (No. S260063). The Supreme Court granted review in *Carney* in March 2020 to consider whether the substantial concurrent causation theory of liability of *People v. Sanchez* (2001) 26 Cal.4th 834 permits a conviction for first degree murder if the defendants did not fire the shot that killed the victim, as well as the impact of *People v. Chiu*, *supra*, 59 Cal.4th 155 and Senate Bill No. 1437 on the rule of *Sanchez*. The Supreme Court later requested that the parties brief the significance, if any, of Senate Bill No. 775 on the issues presented.

Lopez fails to explain how *Carney* might impact this case. In our judgment, it will not because this case does not involve concurrent causation. "[A] cause is concurrent if it was 'operative at the time of the murder and acted with another cause to produce the murder.' " (*People v. Crew* (2003) 31 Cal.4th 822, 846.) The causation issue raised below was not whether Lopez's act of instigating the no-good vote was a concurrent cause of Frosty's death along with the shooting. The issue was whether Lopez set in motion a chain of events that led to Frosty's death. (Cf. *People v. Jennings* (2010) 50 Cal.4th 616, 673.)

### 3. *There is Sufficient Evidence of the Mental Component of Implied Malice*

Lopez also challenges the sufficiency of the evidence of the mental component of implied malice—that is, that he knew that his conduct endangered the life of another and that he acted with conscious disregard for life.

As previously discussed, the trial evidence showed that Lopez encouraged his fellow gang members to deem Frosty no good and, at Lopez's urging, a vote to do just

that was held. The gang expert and nearly every Espe witness testified that a gang member who has been deemed no good is subject to being killed by his former fellow gang members. According to the gang expert, Sureño gang members are *obligated* to kill someone who has been deemed no good. This evidence amply supports the reasonable inferences that Lopez knew that calling for Frosty to be declared no good endangered Frosty's life and that Lopez nevertheless did so with conscious disregard for Frosty's life.

To support his insufficiency of the evidence claim, Lopez notes that the Espe witnesses and the gang expert testified that they were unaware of any Espe gang member ever having been killed as a result of being deemed no good. It is true that none of the Espe witnesses knew of an Espe gang member ever being killed for being no good. However, those witnesses were not asked whether—apart from Frosty—they even knew of an Espe gang member being deemed no good. And while the gang expert was unable to identify another incident in which a member of Espe had killed another member of Espe for being no good, he emphasized that he "did not research previous murders associated to La Esperanza members being deemed no good." Accordingly, the significance of the testimony on which Lopez relies is unclear. It might reasonably be interpreted as demonstrating that no-good orders are rare.

Moreover, there was no shortage of evidence that Espe was a violent gang. Shadow testified that by the time of the 2012 gang meeting, he had not been active in the gang for a few years. He attended the meeting only because he felt he "had no choice" but to go because he feared for his safety and the safety of family if he refused. Melina testified that when Espe members arrived at her house on the day of the 2012 gang meeting she "thought that they were going to shoot up [her] house" because she was dating a Norteño. Instead, they drove her to the gang meeting and, eventually, three members of the gang beat her up for violating gang rules. This evidence, combined with the evidence discussed above regarding the meaning of a no-good order, supports the

16

reasonable inferences that Lopez knew his actions endangered Frosty's life and that Lopez acted with conscious disregard for Frosty's life.

### 4. Neither Senate Bill No. 1437 Nor Senate Bill No. 775 Altered the Mental State Required for Implied Malice Murder

In his supplemental brief following the transfer of this matter from the Supreme Court, Lopez argues that Senate Bill No. 775 narrowed the definition of murder such that a nonkiller cannot be held liable for murder under a theory of implied malice, but must be shown to have exhibited reckless indifference to human life. This argument is premised on a misunderstanding of the nature of implied malice murder liability.

While Lopez purports to be relying on Senate Bill No. 775, in fact his argument depends on changes made by Senate Bill No. 1437.[8] Specifically, he relies on the addition of section 188, subdivision (a)(3) ["Malice shall not be imputed to a person based solely on his or her participation in a crime"] and the addition of the phrase "reckless indifference to human life" to section 189, subdivision (e)(3). He contends that these changes mean prosecutors were required to show that he—in his words, a nonkiller—acted with reckless indifference to human life.

Lopez's theory is flawed. First, Lopez appears to believe that implied malice murder is a theory by which malice is imputed to a person based solely on that person's participation in a different crime. It is not. The trial court's finding of implied malice was based solely on Lopez's own actions and subjective mental state. Malice was

---

[8] Senate Bill No. 775 made no changes to sections 188 and 189, which define murder. Plainly, then, it did not narrow the definition of murder as Lopez now argues. As Lopez notes, Senate Bill No. 775 extended section 1170.95 to those convicted under any "other theory [by] which malice is imputed to a person based solely on that person's participation in a crime." (§ 1170.95, subd. (a)(1).) But that change does not impact Lopez, who was convicted under the natural and probable consequences doctrine and to whom it has always been conceded section 1170.95 applies.

17

not imputed to him based solely on his participation in a crime or based on the actions of others.

Second, Lopez is not a nonkiller under the law. The trial court found that Lopez's own actions proximately caused Frosty's death. True, Salazar's act of shooting Frosty also was a proximate cause of Frosty's death. But there may be more than one cause of death. (CALCRIM No. 520.) Lopez is not like a nonkiller held liable for felony murder to whom section 189, subdivision (e)(3) applies.

5. *Assembly Bill No. 333 Does Not Impact the Trial Court's Finding of Implied Malice*

In his posttransfer brief, Lopez asserts that the trial court must reconsider its finding of implied malice in light of Assembly Bill No. 333 (2021-2022 Reg. Sess.) (Stats. 2021, ch. 699). His argument is two-fold. First, he contends the trial court's finding of implied malice hinged on his guilt of the substantive offense of active participation in a criminal street gang (§ 186.22, subd. (a)). Because Assembly Bill No. 333 altered the elements of that offense, Lopez maintains the court's finding of implied malice cannot stand. Second, Lopez contends that some of the evidence on which the trial court relied in concluding he acted with implied malice is inadmissible under the law as amended by Assembly Bill No. 333. As Lopez correctly notes, following Senate Bill No. 775, courts are limited to considering evidence "that is admissible under current law" at a section 1170.95 evidentiary hearing. (§ 1170.95, subd. (d)(3).) Neither contention has merit.

Assembly Bill No. 333, which took effect on January 1, 2022, amended section 186.22 and added section 1109. The amendments to section 186.22 change the definitions of "criminal street gang" and "pattern of criminal gang activity." Newly added section 1109, subdivision (a) provides that a gang enhancement must be tried separately from the question of the defendant's guilt of the underlying offense at the request of the defense. Section 1109, subdivision (b) requires that a violation of

18

section 186.22, subdivision (a) "be tried separately from all other counts that do not otherwise require gang evidence as an element of the crime."

The trial court's finding that Lopez acted with implied malice did not depend on whether his acts also constituted active participation in a criminal street gang in violation of section 186.22, subdivision (a). Rather, the court relied on Lopez's actions—calling a gang meeting and accusing Frosty of being no good—and his knowledge of the implications of those actions—that Frosty was marked for death. While Lopez's commission of the criminal street gang offense was relevant to the People's trial theory (that Frosty's murder was the natural and probable consequence of that target offense), it was not relevant to the theory the People advanced and the trial court accepted in connection with the section 1170.95 petition (that Lopez was guilty beyond a reasonable doubt of second degree implied malice murder).

Lopez's second argument is that the trial court may have relied on inadmissible evidence in denying his section 1170.95 petition. But he does not identify any specific evidence that he contends is now inadmissible. Indeed, he does not even argue that the substantive legal changes effected by Assembly Bill No. 333 rendered specific evidence inadmissible. Instead, he relies on legislative findings set forth in an uncodified section of Assembly Bill No. 333 to argue that the trial court should reconsider the admissibility of all gang-related evidence.[9] This argument is so vague as to be deemed waived.

Even if we were to reach the merits, we would reject the argument. The evidence on which the trial court relied—the testimony of Lopez's fellow gang members and a gang expert—certainly can broadly be described a gang-related. But—apart from the

---

[9] Those findings include that "gang enhancement evidence can be unreliable and prejudicial to a jury because it is lumped into evidence of the underlying charges which further perpetuates unfair prejudice in juries and convictions of innocent people" and that "[s]tudies suggest that allowing a jury to hear the kind of evidence that supports a gang enhancement before it has decided whether the defendant is guilty or not may lead to wrongful convictions." (Stats. 2021, ch. 699, § 2, subds. (d)(6) & (e).)

testimony of the expert—it also was the testimony of percipient witnesses as to Lopez's words and conduct, their meaning, and those witnesses' understanding as to the likely ramifications thereof. And all of the evidence at issue bore on the elements of second degree implied malice murder. It was not the sort of evidence the Legislature warned can be prejudicial—namely, gang enhancement evidence that is *unrelated* to the underlying charges. (Stats. 2021, ch. 699, § 2, subds. (d)(6) & (e).)

### D.     *Lopez's Constitutional Rights Are Not Implicated by Section 1170.95*

Lopez argues that permitting a trial court to make the factual findings underpinning a determination of ineligibility for section 1170.95 relief violates his federal constitutional rights.

The Due Process Clause of the Fourteenth Amendment and the jury-trial guarantee of the Sixth Amendment, "[t]aken together, . . . indisputably entitle a criminal defendant to 'a jury determination that [he] is guilty of every element of the crime with which he is charged, beyond a reasonable doubt.' " (*Apprendi v. New Jersey* (2000) 530 U.S. 466, 476-477.) In *Apprendi*, the United States Supreme Court held that the federal Constitution requires that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." (*Id*. at p. 490.)

Lopez argues that where the prosecutor seeks to prove a petitioner's ineligibility for section 1170.95 relief for failure to satisfy the third condition, *Apprendi* requires that petitioner's guilt of murder be proved to a jury. We disagree.

Section 1170.95 petitioners are not criminal defendants charged anew with murder and constitutionally entitled to a jury trial. Instead, they stand convicted of murder, their convictions are final, and they can constitutionally be punished for murder despite the ameliorative changes to the law of murder enacted by Senate Bill No. 1437. (See *People v. Conley* (2016) 63 Cal.4th 646, 656 ["the Legislature . . . may choose to modify, limit, or entirely forbid the retroactive application of ameliorative criminal law amendments if

20

it so chooses"]; Gov. Code, § 9608 ["[t]he termination or suspension (by whatsoever means effected) of any law creating a criminal offense does not constitute a bar to the indictment or information and punishment of an act already committed in violation of the law so terminated or suspended, unless the intention to bar such indictment or information and punishment is expressly declared by an applicable provision of law"]; *Dillon v. United States* (2010) 560 U.S. 817, 828 ["We are aware of no constitutional requirement of retroactivity that entitles defendants sentenced to a term of imprisonment to the benefit of subsequent Guidelines amendments"].) Accordingly, "the sentence-[vacatur and] modification proceedings authorized by [section 1170.95] are not constitutionally compelled. . . . Rather, [section 1170.95] represents a [legislative] act of lenity . . . . [¶] Viewed that way, proceedings under [section 1170.95] do not implicate the Sixth Amendment right to have essential facts found by a jury beyond a reasonable doubt." (*Ibid*.) Our colleagues in the First District reached the same conclusion in *People v. Anthony* (2019) 32 Cal.App.5th 1102, 1156 and again more recently in *People v. James* (2021) 63 Cal.App.5th 604, 609-611 (*James*).)

Furthermore, a factual finding that results in ineligibility for section 1170.95 relief does not increase the penalty for a crime. "[I]t simply leaves the original sentence intact." (*People v. Perez* (2018) 4 Cal.5th 1055, 1064 (*Perez*).) Accordingly, *Apprendi* is not implicated and "the Sixth Amendment does not prohibit trial courts from relying on facts not found by a jury in determining" section 1170.95 eligibility. (*Perez*, at p. 1064 [addressing Proposition 36 resentencing].)

In his supplemental posttransfer brief, Lopez notes that our Supreme Court has left open the question of whether the denial of a section 1170.95 petition on the basis of facts found by the trial court runs afoul of *Apprendi*. (*Gentile*, *supra*, 10 Cal.5th at p. 857.) "Pending further clarification from the Supreme Court," like our colleagues in the First District, we remain convinced "that a convicted person litigating a section 1170.95 petition does not enjoy the rights that the Sixth Amendment guarantees to criminal

21

defendants who have not yet suffered a final conviction. As just stated, the Legislature was not constitutionally required to make the amended definition of murder created by Senate Bill No. 1437 retroactive as to convictions, like appellant's, that had become final." (*James*, *supra*, 63 Cal.App.5th at p. 610.)

### E.    Attorney Conflict of Interest

Finally, Lopez argues his attorney below suffered from an actual conflict of interest such that he was deprived of his Sixth Amendment right to the assistance of counsel. Lopez was represented on his section 1170.95 petition in the trial court by Assistant Public Defender Jeremy Dzubay of the Monterey County Public Defender's Office. The Public Defender, Susan Chapman, represented Lopez's codefendant—Salazar—at their joint trial. Lopez says Chapman's prior representation of Salazar constitutes a conflict of interest that must be imputed to Dzubay and that requires automatic reversal.

#### 1.    Factual Background

Lopez was tried jointly with Salazar in 2014. At trial, Lopez was represented by attorney Joseph Martin, as the Monterey County Public Defender's Office had declared a conflict as to Lopez. Salazar was represented by Chapman, who was then with the alternate defender's office. Chapman later became the Monterey County Public Defender, a position she held when Lopez filed his section 1170.95 petition.

Shortly after Lopez filed his petition, attorney Marc Zilversmit filed a motion for appointment of counsel on Lopez's behalf. Zilversmit was Lopez's appointed appellate counsel on direct appeal and represents him in the current appeal. In the motion, Zilversmit stated that his own appointment as Lopez's attorney would be appropriate based on his professional qualifications and familiarity with the case. The motion did not mention any potential conflict of interest that might preclude the appointment of the public defender.

22

Both Zilversmit and a deputy public defender appeared for Lopez at the first hearing on the petition on February 14, 2019. At that hearing, Zilversmit stated "I think your honor recalls that there was a conflict with the public defender who was representing the codefendant in this two-defendant case." It is not clear whether this was a reference to Chapman's prior representation of Salazar. The trial court apparently understood it as a reference to the fact that the public defender's office had declared a conflict as to Lopez prior to trial, responding: "[n]onetheless, even when probation violations come in or other matters where the public defender has conflicted out, we still go through that procedure, even though it may seem obvious to us that there may be another conflict filed. Sometimes there isn't, for whatever reason." The trial court declined to appoint Zilversmit, explaining that County procedures require the appointment of the public defender's office in the first instance, and then of the alternate defender's office in the event the public defender's office declares a conflict.

The public defender's office accepted the appointment pending a determination as to the existence of any conflict. At a hearing a week later, Dzubay appeared for Lopez and indicated that the public defender's office would not be declaring a conflict. Dzubay represented Lopez throughout the proceedings below.

      2.    *Legal Principles*

"Both the United States Constitution and the California Constitution guarantee criminal defendants the right to the assistance of counsel unburdened by any conflicts of interest. [Citation.] Essentially, a claim of conflict of interest constitutes a form of ineffective assistance of counsel. [Citations.] In order to demonstrate a violation of the federal and state Constitutions based on a conflict of interest, a defendant must show that his or her counsel was burdened by an 'actual' conflict of interest—one that in fact adversely affected counsel's performance. [Citation.] When determining whether counsel's performance was ' "adversely affected" ' by the purported conflict under this standard, we consider whether ' "counsel 'pulled his punches,' i.e., whether counsel

23

failed to represent defendant as vigorously as he might have, had there been no conflict." ' [Citation.]" (*People v. Perez* (2018) 4 Cal.5th 421, 435.) " ' "In undertaking such an inquiry, we are . . . bound by the record. But where a conflict of interest causes an attorney not to do something, the record may not reflect such an omission. We must therefore examine the record to determine (i) whether arguments or actions omitted would likely have been made by counsel who did not have a conflict of interest, and (ii) whether there may have been a tactical reason (other than the asserted conflict of interest) that might have caused any such omission." ' [Citation.]" (*People v. Johnson* (2018) 6 Cal.5th 541, 578.)

The United States Supreme Court has created a narrow exception to the foregoing. Reversal is automatic "where defense counsel is forced to [jointly] represent codefendants over his timely objection, unless the trial court has determined that there is no conflict." (*Mickens v. Taylor* (2002) 535 U.S. 162, 168, citing *Holloway v. Arkansas* (1978) 435 U.S. 475, 488 ["whenever a trial court improperly requires joint representation over timely objection reversal is automatic"].)

### 3. Analysis

Lopez contends that the automatic reversal rule applies here. It does not, for two independent reasons. This is not a case of joint representation of codefendants, but of successive representation. And Lopez's counsel—Dzubay and the public defender's office—did not object. Nor did Zilversmit bring the alleged conflict to the attention of the trial court judge. As noted above, he stated only, "I think your honor recalls that there was a conflict with the public defender who was representing the codefendant in this two-defendant case." The record demonstrates that that vague statement failed to make the trial court judge aware that the current public defender represented Lopez's codefendant at trial. Instead, the trial court reasonably interpreted Zilversmit's statement as referring to the fact that the public defender's office had declared a conflict as to Lopez years earlier.

24

Because automatic reversal is not required, Lopez must demonstrate that his counsel's performance was adversely affected by the purported conflict. He attempts to carry that burden by faulting counsel below for not asking for an evidentiary hearing, not calling Salazar as a witness regarding the no-good meeting and discussion, and not blaming Salazar for acting independently from Lopez and the no-good meeting. Lopez claims these unpursued strategies were adverse to Salazar, but potentially helpful to him. Lopez fails to show that counsel's performance was adversely affected.

First, the parties were free to offer evidence at the section 1170.95, subdivision (d) hearing; they simply chose not to. Accordingly, counsel had no reason to request an evidentiary hearing; such a hearing was held.

Second, Lopez gives us no reason to suspect that conflict-free counsel would have called Salazar as a witness. Salazar did not testify at trial and we are unaware of any statements he has made about the gang meeting and the no-good vote. Accordingly, Lopez's suggestion that Salazar's testimony would have been favorable to him is purely speculative. Moreover, numerous Espe witnesses testified at trial regarding the gang meeting and the no-good vote. Had Salazar offered a starkly different account of those events at the hearing, it is unlikely that the trial court would have credited it.

Third, Lopez fails to show that conflict-free counsel would have been able to more persuasively argue that Salazar killed Frosty for reasons unrelated to Lopez and the no-good vote. Counsel below squarely placed the blame for Frosty's death on Salazar, arguing in his brief: "The injury that caused Frosty's death was the gunshot wounds inflicted by Salazar. Lopez's physical act of calling a meeting could not cause Frosty's death because it was not directly connected with the gunshot wounds." Counsel below did not concede that Salazar was acting pursuant to the no-good vote. Nor did Chapman make that argument at trial. To the contrary, she argued that Salazar killed Frosty for reasons unrelated to Lopez and the no-good vote—namely, in self-defense and defense of another. The jury rejected those defenses when it convicted Salazar of first degree

25

murder.  Lopez points to no evidence (and we are aware of none) suggesting that Salazar had any motive to kill Frosty—a member of his own gang—other than because Frosty had been deemed no good.  Accordingly, it is unclear what more counsel could have done to argue that Salazar acted independently of the no-good vote.

For the foregoing reasons, Lopez's conflict of interest claim fails.

## III.   DISPOSITION

The order is affirmed.

_____
ELIA, ACTING P.J.

WE CONCUR:


_____
BAMATTRE-MANOUKIAN, J.



_____
DANNER, J.



*People v. Lopez*
H047254